IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RONNIE O. MORTON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, | : | |
| Commissioner of Social Security | : | NO. 19-3650 |

O P I N I O N

JACOB P. HART                                                  DATE:  June 2, 2020
UNITED STATES MAGISTRATE JUDGE

      Ronnie O. Morton brought this action under 20 USC § 405(g) to obtain review of the decision of the Commissioner of Social Security denying his claim for Supplemental Security Income ("SSI").  He has filed a Request for Review to which the Commissioner has responded, and has also filed a reply brief.  As set forth below, Morton's Request for Review will be denied and judgment granted in favor of the Commissioner.

I.      Factual and Procedural Background

      Morton was born on April 21, 1971.  Record at 504.  He completed the tenth grade. Record at 60.  He worked for two years as a material handler preparing insulation tanks.  Record at 92-4.  He has had a high number of contacts with the legal system.  Record at 950.  On February 5, 2015, Morton filed an application for SSI in which he alleged disability as of January 1, 2012, as a result of schizophrenia and anxiety.  Record at 504, 548.  The alleged disabled date was later amended to February 12, 2015.  Record at 57.

Morton's application for disability was initially denied on May 13, 2015.  Record at 207.  He then sought *de novo* review by an Administrative Law Judge ("ALJ").  Record at 275.  The first hearing was held in this case on June 16, 2017.  Record at 149.  On August 24, 2017, the ALJ issued a written decision denying benefits.  Record at 209.

The Appeals Council, however, remanded the case to the ALJ.  Record at 232.  A second hearing before the same ALJ was held on May 22, 2018.  Record at 99.  The ALJ issued another decision on June 27, 2018, again denying benefits.  Record at 239.  Once more, however, the Appeals Council remanded the case, this time to a different ALJ.  Record at 259.[1]

A third hearing was held in this case on March 3, 2019.  Record at 53.  A third unfavorable opinion was issued on March 20, 2019.  Record at 14.  This time, the Appeals Council denied Morton's request for review, permitting the decision of the ALJ to stand as the final decision of the Commissioner.  Record at 1.  Morton then filed this action.

II.   Legal Standards

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389 (1971); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Newhouse v. Heckler, 753 F.2d 283, 285 (3d Cir. 1985).  Substantial evidence is relevant evidence viewed objectively as adequate to support a decision.  Richardson v. Perales, supra, at 401; Kangas v. Bowen, 823 F.2d 775 (3d Cir. 1987); Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979).  Moreover, apart from the substantial evidence inquiry, a reviewing court must also ensure that the ALJ applied the proper legal standards.  Coria v. Heckler, 750 F.2d 245 (3d Cir. 1984).

---

[1] The reasons this case was remanded are not relevant at this point, and need not be discussed.

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." 42 U.S.C. §423(d)(1). As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in §404.1590, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (iv). At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v). At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 CFR §404.1520 (references to other regulations omitted).

III.     The ALJ's Decision and Morton's Request for Review

In his decision, the ALJ determined that Morton suffered from the severe impairments of a schizoaffective disorder, an anxiety disorder, a bulging disc in the lumbar spine, and cervical disc degeneration. Record at 20. He decided that none of these impairments, and no combination of impairments, met or equaled a listed impairment. Record at 20.

The ALJ wrote:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity ["RFC"] to perform light work as defined in 20 CFR §416.967(b) except can [*sic*] stand four hours per eight hour workday but not more than one hour at a time; can walk a total of four hours but not more than one hour at a time;

3

>can never climb ladders or scaffolds; can occasionally stoop; is limited to simple, repetitive tasks; can tolerate few workplace changes; no interaction with the general public; and can work in proximity to others but not in tandem with them or as part of a team.

Record at 22.

Relying upon the testimony of a vocational expert who appeared at the hearing, the ALJ determined that Morton could not return to his prior work, but could work as a mail clerk or as a ticketer. Record at 41. He concluded, therefore, that Morton was not disabled. Record at 42.

In his Request for Review, Morton argues that the ALJ erred in failing to credit the testimony of the mental health expert who appeared at his second hearing, Richard W. Cohen, MD. He also maintains that the ALJ erred in failing to credit the Third-Party Report submitted by his sister, and in failing to even mention additional third-party submissions.

IV.     <u>Discussion</u>

A.      <u>Dr. Cohen</u>

Each of the mental health listings set forth at Section 12 of 20 CFR Part 404, Subsection A, Appendix 1, has an A section, which sets forth the characteristics of a specific disorder. However, to meet a listing, a claimant must also meet the criteria of either the B section or the C section, which pertain to the severity of symptoms. They are identical for all of the mental health listings. The B section is met where a claimant demonstrates an extreme limitation in one, or a marked limitation in two, of specified functional areas (the ability to understand, remember, and/or apply information; to interact with others; to concentrate and/or maintain pace; and to adapt of manage oneself. 20 CFR §12.00A(2)(b)). The Part B criteria are not at issue in this case.

Section C sets forth criteria used to evaluate "serious and persistent disorders." To meet section C, a claimant must come forward with a medically documented history of the existence

of the disorder over a period of at least two years, *and* evidence that demonstrates both (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting that is ongoing and which diminishes the symptoms and signs of the mental disorder, and (2) marginal adjustment, meaning a minimal capacity to adapt to changes in the claimant's environment, or to demands that are not already a part of his daily life.  20 CFR Part 404, Subpart P, Appendix 1, §§ 12.00A(2)(c); 12.03C; 12.04C; 12.06C and 12.15C.

Dr. Cohen, a board-certified psychiatrist, testified at Morton's hearing of May 22, 2018, that Morton met the A criteria for the listed impairments at 12.03 for schizophrenia; 12.04 for an affective disorder (depression); 12.06 for a panic disorder; and 12.15 for post-traumatic stress syndrome.  Record at 110-111.  He also testified that Morton met the C criteria:

> I feel if we look at the C criteria … he's got marginal ability to adapt to the stress at work.  If I add the stress at work on top of anything he does, he would have an increase in his auditory, an increase in his auditory hallucinations, an increase in his panic attacks, an increase in his paranoid ideations, an increase in his anger outbursts, an increase in his obsessions, delusions, an increase in his nightmares, flashbacks, intrusive memories, sleeping problems to the point where he would miss more than three days a month of work.

Record at 111.

The ALJ who issued Morton's third opinion, which is reviewed herein, did not credit Dr Cohen's testimony.  He wrote:

> This assessment is given little weight as it is not consistent with or supported by the record as a whole, which is discussed in further detail below, including the lack of a diagnosis of schizophrenia in the record prior to 2019, the generally normal mental status examinations throughout, and the denial of and/or lessening of frequency of auditory hallucinations with medications.  Additionally, the claimant was not consistent in his symptom complaints and sought treatment from multiple sources at the same time.  It would be difficult to know based on this record whether the claimant was truly in remission from his substance abuse.

Record at 22.

Some of Morton's criticisms of this analysis are valid. The ALJ's uncertainty as to whether Morton was in remission from his substance abuse is not pertinent in this context. Dr. Cohen testified in 2018, and saw almost all of the records seen by the ALJ. He was aware of Morton's history of drug abuse, but concluded that the drug use stopped in 2015. Record at 109. If the ALJ's basis for failing to credit Dr. Cohen was a belief that the symptoms the doctor relied upon were the result of current drug use, and not of mental illness, the ALJ should have performed the required analysis under 20 CFR § 416.935.

Nor does the lack of a diagnosis of schizophrenia in the record until 2019 appear to be meaningful. Dr. Cohen explained that he was aware that Morton was diagnosed with a schizoaffective disorder, but that, in his opinion, the symptoms were more consistent with schizophrenia and a separate diagnosis of depression. Record at 109. Dr. Cohen was a qualified and experienced psychiatrist, and was entitled to reach an independent opinion in this regard. Further, both schizoaffective disorder and schizophrenia involve psychotic symptoms, so it is unclear whether the difference between the two disorders is meaningful here.

In any event, the ALJ found that Morton suffered from the severe impairments of a schizoaffective disorder and an anxiety disorder. Record at 20. This means that he conceded that Morton met the A criteria of at least two listings. The only meaningful dispute, therefore, is whether Morton met the C criteria, without which he could not be found to meet a listing.

As to this, the ALJ's rejection of Dr. Cohen's finding that the C criteria were met was supported by substantial evidence. I reach this conclusion with some difficulty, since Morton's history, with its drug abuse, numerous arrests, and periods of homelessness, was certainly suggestive of mental instability. Nevertheless, there is no objective evidence confirming the presence of the severe psychotic symptoms from which Dr. Cohen found Morton to suffer.

At his third hearing, Morton testified that he experienced auditory hallucinations and paranoia, and had experienced them since 1997. Record at 75. He had been receiving Social Security benefits on the basis of mental illness before an incarceration which pre-dated the present application. Record at 76. By the time of the third hearing, Morton had been discharged from the halfway house where he had been placed following incarceration, after nearly three years of residence, and was homeless. Record at 71. He testified that he spent periods of 45 minutes or an hour, several times per week, standing on the street screaming at the voices in his head to go "the F" away. Record at 71-2.

Nevertheless, with all of his complicated history, it does not appear that Morton has ever undergone a mental hospitalization. This is what he reported to John F. Kennedy Behavioral Health on January 4, 2019. Record at 1225. It is also what he told the consulting examiner, Charles Johnson, Psy. D., on April 22, 2015. Record at 742.

According to Dr. Johnson, although Morton initially denied hospitalization, he later said that he had been placed in a psychiatric unit for two weeks during his 2013-2014 incarceration, because of making suicidal statements. Record at 742. However, Morton's inmate treatment records do not support this. The records, dated between September, 2013, and October, 2014, were not extensive, and they all concerned his physical health. Record at 606-736. There was no mention of mental health, either in the physicians' records or in separate mental health treatment notes. Id.

On the contrary, in a form dated April 17, 2014, completed when Morton was transferred to another facility, Morton reported that he had no mental health issues. Record at 697. Specifically, he gave negative answers to the questions: "Do you have thoughts of hurting yourself or others?", "Is there a history of suicide attempts?" and also "Do you hear voices?".

Id.  The form was co-signed by a Registered Nurse.  Id.  Another form, completed in connection with a September 27, 2013, transfer, also reported no mental health problems or suicide attempts.  Record at 698.

Thus, a two-week hospitalization is not corroborated.  Further, even taking into consideration that mental health treatment in a prison is not the best, it seems unlikely that Morton could have been experiencing severe psychotic symptoms without obtaining any medical attention at all.  Even in prison, it is hard to believe that an inmate's screaming for hours at the voices in his head would not generate some sort of medical treatment note.

Nor was Morton's outpatient mental health treatment extensive after his incarceration.  At the hearing, Morton testified that he saw a therapist twice per month.  Record at 69.  During the years when he lived at the halfway house, he told Dr. Johnson that he had therapy once per week.  Record at 742.  He mentioned treating at City Wide Health Clinic and JFK Behavioral Health.  Id.  The records indicate that he also obtained counseling from another source, Berlin Medical Associates, in 2015 and 2016, where he was prescribed the anti-anxiety medicine Buspar.  Record at 853-865.

This lack of intensive treatment is particularly significant here in determining the intensity of Morton's symptoms, because his statements can be unreliable.[2]  I am not sure it is possible to know whether Morton's inconsistency is an attempt to somehow obtain a benefit,

---

[2] Morton represented to the prison system that he had no history of drug abuse.  Record at 696, 698.  In April, 2015, he specifically denied to Dr. Johnson that he had "a past history of using any illicit drugs." Record at 743.  He admitted to the ALJ at his second hearing that he used Suboxone, but stated that it was for control of his back pain.  Record at 105.  Yet, in a treatment note of February 20, 2017, treating psychiatrist Zaw Myint, MD, wrote: "He is informed [*sic?*] that he has been on Suboxone 8 milligrams twice a day since September, 2016, which he did not inform this doctor at evaluation or later. He has been on Suboxone on and off since 2011 as he has a long history heroin addiction since age 10."  Record at 997.  Morton's treatment notes from Berlin Medical Associates also record severe cravings to use heroin.  Record at 855, 864.  On June 13, 2015, Morton admitted to being "on/off heroin – one day ago."  Record at 865.  In November, 2015, he relapsed on cocaine.  Record at 860.

8

perhaps by disguising symptoms of drug abuse as symptoms of mental illness (as the ALJ obviously suspected) or whether he sought to avoid the stigma of substance abuse (as his counsel suggests). It may be a symptom of his mental illness.[3] In any event, because Morton's statements have been so inconsistent, it is important to look to his lack of mental hospitalizations, partial hospitalizations, or other intensive treatment.

Similarly, observations of Morton by mental health practitioners fail to prove the existence of severely limiting symptoms. Dr. Johnson, the consulting examiner who saw Morton on April 22, 2015, reported that he was cooperative, with an adequate manner of relating, social skills, and overall presentation, and fluent and clear speech. Record at 744. He was fully oriented, and had coherent and goal-directed thought processes, and intact memory. Record at 744-5. He showed no evidence of hallucinations, delusions, or paranoia "in the evaluation setting." Record at 744. Dr. Johnson diagnosed Morton only with an adjustment disorder with depressed mood. Record at 745.

Further, Dr. Myint, Morton's treating psychiatrist at Citywide Community Counseling Services, indicated in two mental RFC assessment forms, dated May 12, 2017, and April 26, 2018, that Morton had only slight limitations in understanding, remembering, and carrying out short and simple instructions. Record at 1149-50, 1209-10. Other than that, Dr. Myint found

---

[1] Some behavior could also have been a function of substance abuse. On Morton's second visit to JFK Behavioral Health, on May 1, 2015, he was described as "drug seeking for Xanax and possibly also secondary gain for disability." Record at 756. The treatment note read: "44 y/o male with antisocial personality d/o presented requesting a prescription for Xanax. Pt. reported vague sx of depression and of 'schizophrenia.' When asked to provide details, he was unable to do so. Pt changed his story many times, giving conflicting information, he did not allow the writer to call his half way house to confirm his dx & his medications. He has an extensive legal hx and reports that 'the voices tell him to commit crimes', he shows no remorse of his actions. He has never been hospitalized for mental illness, no suicide attempts." Record at 757. His prognosis was described as "Good, pt does not seem to be suffering from any sx at this time." Id. Morton then discontinued treatment at JFK, although he returned for at least two more appointments in 2018 and 2019. Record at 1219.

moderate limitations in all areas, including the ability to respond appropriately to work pressures, or to changes in the work routine.

Dr. Myint's findings are supported by treatment records from Citywide Community Counseling, which uniformly described Morton as fully oriented, with intact memory and normal speech, affect, thought process, concentration, and attention, although he often had a depressed mood. Record at 951-3, 959, 969-980. Usually, he also had normal thought content, although on April 2, 2015, he was noted to have delusions and obsessions. Record at 959.

When Morton resumed treatment at JFK Behavioral Health, on December 17, 2018, he described suffering from auditory hallucinations. Record at 1219, 1220. However, upon examination he was fully oriented, with a normal mood and affect. Record at 1221. He had normal thought processes and unremarkable thought content. Record at 1222-3. He had good concentration and attention. Record at 1222. Although Morton was diagnosed with a schizoaffective disorder at JFK, he also appeared at the only other recorded appointment fully oriented, with normal thought processes and thought content, and good memory and concentration. Record at 1230-31,

On the basis of the foregoing, it is clear that substantial evidence obtained from treating and examining sources supported the ALJ in rejecting Dr. Cohen's opinion that Morton met the C criteria of marginal adjustment. The halfway house where Morton resided could be considered a highly structured setting. See Record at 639. However, medical evidence from the time after he left the halfway house, specifically the 2018 and 2019 visits to JFK Behavioral Health, and the 2017 and 2018 evaluations by Dr. Myint, do not show a mental decline which would prove a marginal adjustment. There is no historical evidence that work pressure caused Morton to decompensate mentally, since he was unemployed during the entire relevant period.

Morton argues that, because Dr. Cohen appeared before a different ALJ than the one who issued this decision, the present ALJ should have recalled Dr. Cohen for questioning if he had doubts about the doctor's testimony.  However, there is no indication that the ALJ found Dr. Cohen's testimony unclear.  Instead, he found it was inconsistent with the other evidence.

B.      The Third-Party Evidence

The ALJ clearly erred with respect to third-party evidence.  Morton's stepsister, Janell Perrigen, completed a Third-Party Function Report on February 25, 2015.  Record at 580.  She wrote that Morton was unable to work because of anxiety attacks and deficiencies in memory, concentration and understanding.  Record at 581, 585.

The ALJ wrote:

> Because Ms. Perrigen is not medically trained to make exact observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms, the accuracy of the information provided is questionable.  Little weight is given to the Third Party Function Report because it, like the claimant's allegations, is simply not consistent with or support[ed] by the record as a whole.

Record at 40.

Despite the Agency's attempt to provide guidance, there appears to be a chronic misunderstanding on the part of many ALJs as to the function of third-party, lay, evidence.  The Agency has specifically directed an ALJ to "consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file."  SSR 16-3p.  Therefore, while a third party cannot diagnose an impairment, or give a medical prognosis, she is perfectly competent to describe what she sees.  It is simply untenable to reject lay evidence on the basis that it was prepared by a layperson.

Nevertheless, in this case the ALJ's error was not material, because he also rejected the report as inconsistent with the record as a whole.  This was accurate.  As above, Morton was consistently described by his treating and examining physicians as having normal concentration, memory, and understanding.  Dr. Johnson found that Morton had intact attention and concentration and long and short-term memory.  Record at 744.  He also indicated that Morton was not limited at all in the ability to understand and carry out short, simple, instructions, and only mildly limited in the ability to understand and remember complex instructions.  Record at 739.  Treatment notes from JFK Behavioral Health also reported normal concentration and attention.  Record at 1222, 1231.

Dr. Myint indicated that Morton was only slightly impaired in his ability to understand and carry out short, simple instructions.  Record at 1209.  This was supported by the treatment notes from Citywide Community Counseling Services.  Record at 951-3, 959, 969-980.

Also appearing in the record are four letters prepared by Morton's other family members and friends.  Record at 635, 363, 367, and 638.  All of the letters describe Morton as paranoid, and self-isolating, and they describe him as having appeared mentally unstable all of his life.  A fifth letter, by a director of the halfway house, also described Morton as isolative.  Record at 639.  I agree with Morton that the ALJ erred in failing to mention these submissions.  As discussed above, the Administration has instructed decision-makers to consider personal observations of a client.  SSR 16-3p.

Nevertheless, although the ALJ's failure to address lay opinion testimony is technically error, remand is not required where the testimony would not have changed the outcome of the case.  See Butterfield v. Astrue, Civ. A. No. 06-603, 2011 WL 1740121 at *6 (E.D. Pa. May 5, 2011).

Here, the authors' descriptions of Morton as a troubled individual are well-supported by record evidence indicating that he has led a troubled life. However, the majority of the evidence supports the ALJ's assessment of Morton's symptoms. Despite the fact that Morton has frequently accessed mental health care services, his psychiatric illness has never been found to warrant hospitalization or intensive treatment. Treating and examining health care practitioners have described him as generally functional, despite his mental illness. The third-party letters do not undermine this evidence.

V.      Conclusion

In accordance with the above discussion, I conclude that the decision of the Appeals Council should be affirmed, and judgment entered in favor of the Commissioner.


BY THE COURT:


/s/ Jacob P. Hart

_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE